ANTONIA BOVE, Appellant, *v.* DONNER-HANNA COKE CORPORATION, Respondent.*

Fourth Department, June 29, 1932.

---

* Affg. 142 Misc. 329.

*Willard H. Ticknor* [*Robert W. McNulty* of counsel], for the appellant.

*Dana B. Hellings* [*Ralph Ulsh* and *Francis M. Shea* of counsel], for the respondent.

EDGCOMB, J. The question involved upon this appeal is whether the use to which the defendant has recently put its property constitutes a private nuisance, which a court of equity should abate.

In 1910 plaintiff purchased two vacant lots at the corner of Abby and Baraga streets in the city of Buffalo, and two years later built a house thereon. The front of the building was converted into a grocery store, and plaintiff occupied the rear as a dwelling. She rented the two apartments on the second floor.

Defendant operates a large coke oven on the opposite side of Abby street. The plant runs twenty-four hours in the day, and three hundred and sixty-five days in the year. Of necessity, the operation has to be continuous, because the ovens would be ruined if they were allowed to cool off. The coke is heated to a temperature of around 2,000 degrees F., and is taken out of the ovens and run under a " quencher," where 500 or 600 gallons of water are poured onto it at one time. This is a necessary operation in the manufacture of coke. The result is a tremendous cloud of steam, which rises in a shaft and escapes into the air, carrying with it minute portions of coke, and more or less gas. This steam and the accompanying particles of dirt, as well as the dust which comes from a huge coal pile necessarily kept on the premises, and the gases and odors which emanate from the plant, are carried by the wind in various directions, and frequently find their way onto the plaintiff's premises and into her house and store. According to the plaintiff this results in an unusual amount of dirt and soot accumulating in her house, and prevents her opening the windows on the street side; she also claims that she suffers severe headaches by breathing the impure air occasioned by this dust and these offensive odors, and that her health and that of her family has been impaired, all to her very great discomfort and annoyance; she also asserts that this condition has lessened the rental value of her property, and has made it impossible at times to rent her apartments.

Claiming that such use of its plant by the defendant deprives her of the full enjoyment of her home, invades her property rights, and constitutes a private nuisance, plaintiff brings this action in equity to enjoin the defendant from the further maintenance of said nuisance, and to recover the damages which she asserts she has already sustained.

As a general rule, an owner is at liberty to use his property as he sees fit, without objection or interference from his neighbor, provided such use does not violate an ordinance or statute. There is, however, a limitation to this rule; one made necessary by the intricate, complex and changing life of to-day. The old and familiar maxim that one must so use his property as not to injure that of another (*sic utere tuo ut alienum non lœdas*) is deeply imbedded in our law. An owner will not be permitted to make an unreasonable use of his premises to the material annoyance of his neighbor if the latter's enjoyment of life or property is materially lessened thereby. This principle is aptly stated by ANDREWS, Ch. J., in *Booth* v. *R., W. & O. T. R. R. Co.* (140 N. Y. 267, 274) as follows: " The general rule that no one has absolute freedom in the use of his property, but is restrained by the co-existence of equal rights in his neighbor to the use of his property, so that each in exercising his right must do no act which causes injury to his neighbor, is so well understood, is so universally recognized, and stands so impregnably in the necessities of the social state, that its vindication by argument would be superfluous. The maxim which embodies it is sometimes loosely interpreted as forbidding all use by one of his own property, which annoys or disturbs his neighbor in the enjoyment of his property. The real meaning of the rule is that one may not use his own property to the injury of any legal right of another."

Such a rule is imperative, or life to-day in our congested centers would be intolerable and unbearable. If a citizen was given no protection against unjust harassment arising from the use to which the property of his neighbor was put, the comfort and value of his home could easily be destroyed by any one who chose to erect an annoyance nearby, and no one would be safe, unless he was rich enough to buy sufficient land about his home to render such disturbance impossible. When conflicting rights arise, a general rule must be worked out which, so far as possible, will preserve to each party that to which he has a just claim.

While the law will not permit a person to be driven from his home, or to be compelled to live in it in positive distress or discomfort because of the use to which other property nearby has been put, it is not every annoyance connected with business which will be enjoined. Many a loss arises from acts or conditions which do not create a ground for legal redress. *Damnum absque injuria* is a familiar maxim. Factories, stores and mercantile establishments are essential to the prosperity of the nation. They necessarily invade our cities, and interfere more or less with the peace and tranquillity of the neighborhood in which they are located.

One who chooses to live in the large centers of population cannot expect the quiet of the country. Congested centers are seldom free from smoke, odors and other pollution from houses, shops and factories, and one who moves into such a region cannot hope to find the pure air of the village or outlying district. A person who prefers the advantages of community life must expect to experience some of the resulting inconveniences. Residents of industrial centers must endure without redress a certain amount of annoyance and discomfiture which is incident to life in such a locality. Such inconvenience is of minor importance compared with the general good of the community. (*Doellner* v. *Tynan*, 38 How. Pr. 176, 184; *Campbell* v. *Seaman*, 63 N. Y. 568, 577; *Strachan* v. *Beacon Oil Co.*, 251 Mass. 479, 487; *Downing* v. *Elliott*, 182 id. 28; *Alexander* v. *Stewart Bread Co.*, 21 Penn. Sup. Ct. 526.)

Whether the particular use to which one puts his property constitutes a nuisance or not is generally a question of fact, and depends upon whether such use is reasonable under all the surrounding circumstances. What would distress and annoy one person would have little or no effect upon another; what would be deemed a disturbance and a torment in one locality would be unnoticed in some other place; a condition which would cause little or no vexation in a business, manufacturing or industrial district might be extremely tantilizing to those living in a restricted and beautiful residential zone; what would be unreasonable under one set of circumstances would be deemed fair and just under another. Each case is unique. No hard and fast rule can be laid down which will apply in all instances. (*McCarty* v. *Natural Carbonic Gas Co.*, 189 N. Y. 40; *Bates* v. *Holbrook*, 171 id. 460, 475; *Gordon* v. *Village of Silver Creek*, 127 App. Div. 888, 891; affd., 197 N. Y. 509; *Roscoe Lumber Co.* v. *Standard Silica Co.*, 62 App. Div. 421, 422; *Peck* v. *Newburgh Light, Heat & Power Co.*, 132 id. 82; *Riedeman* v. *Mt. Morris El. Light Co.*, 56 id. 23; *Strachan* v. *Beacon Oil Co.*, 251 Mass. 479, 487.)

The inconvenience, if such it be, must not be fanciful, slight or theoretical, but certain and substantial, and must interfere with the physical comfort of the ordinarily reasonable person. (*Downing* v. *Elliott*, 182 Mass. 28; *Ross* v. *Butler*, 19 N. J. Eq. 294, 298, 299; *Columbus Gas, etc., Co.* v. *Freeland*, 12 Ohio St. 392, 399; *Tuttle* v. *Church*, 53 Fed. 422, 426; *Sherman Gas & El. Co.* v. *Belden*, 123 S. W. 119.)

Applying these general rules to the facts before us, it is apparent that defendant's plant is not a nuisance *per se*, and that the court was amply justified in holding that it had not become one by reason of the manner in which it had been conducted. Any annoy-

ance to plaintiff is due to the nature of the business which the defendant conducts, and not to any defect in the mill, machinery or apparatus. The plant is modern and up to date in every particular. It was built under a contract with the Federal government, the details of which are not important here. The plans were drawn by the Kopperas Construction Company, one of the largest and best known manufacturers of coke plants in the world, and the work was done under the supervision of the War Department. No reasonable change or improvement in the property can be made which will eliminate any of the things complained of. If coke is made, coal must be used. Gas always follows the burning of coal, and steam is occasioned by throwing cold water on red hot coals.

The cases are legion in this and other States where a defendant has been held guilty of maintaining a nuisance because of the annoyance which he has caused his neighbor by reason of noise, smoke, dust, noxious gases and disagreeable smells which have emanated from his property. But smoke and noisome odors do not always constitute a nuisance. I find none of these cases controlling here; they all differ in some particular from the facts in the case at bar.

It is true that the appellant was a resident of this locality for several years before the defendant came on the scene of action, and that, when the plaintiff built her house, the land on which these coke ovens now stand was a hickory grove. But in a growing community changes are inevitable. This region was never fitted for a residential district; for years it has been peculiarly adapted for factory sites. This was apparent when plaintiff bought her lots and when she built her house. The land is low and lies adjacent to the Buffalo river, a navigable stream connecting with Lake Erie. Seven different railroads run through this area. Freight tracks and yards can be seen in every direction. Railroads naturally follow the low levels in passing through a city. Cheap transportation is an attraction which always draws factories and industrial plants to a locality. It is common knowledge that a combination of rail and water terminal facilities will stamp a section as a site suitable for industries of the heavier type, rather than for residential purposes. In 1910 there were at least eight industrial plants, with a total assessed valuation of over a million dollars, within a radius of a mile from plaintiff's house.

With all the dirt, smoke and gas which necessarily come from factory chimneys, trains and boats, and with full knowledge that this region was especially adapted for industrial rather than residential purposes, and that factories would increase in the future,

plaintiff selected this locality as the site of her future home. She voluntarily moved into this district, fully aware of the fact that the atmosphere would constantly be contaminated by dirt, gas and foul odors; and that she could not hope to find in this locality the pure air of a strictly residential zone. She evidently saw certain advantages in living in this congested center. This is not the case of an industry, with its attendant noise and dirt, invading a quiet, residential district. It is just the opposite. Here a residence is built in an area naturally adapted for industrial purposes and already dedicated to that use. Plaintiff can hardly be heard to complain at this late date that her peace and comfort have been disturbed by a situation which existed, to some extent at least, at the very time she bought her property, and which condition she must have known would grow worse rather than better as the years went by.

To-day there are twenty industrial plants within a radius of less than a mile and three-quarters from appellant's house, with more than sixty-five smokestacks rising in the air, and belching forth clouds of smoke; every day there are 148 passenger trains, and 225 freight trains, to say nothing of switch engines, passing over these various railroad tracks near to the plaintiff's property; over 10,000 boats, a large portion of which burn soft coal, pass up and down the Buffalo river every season. Across the street, and within 300 feet from plaintiff's house, is a large tank of the Iroquois Gas Company which is used for the storage of gas.

The utter abandonment of this locality for residential purposes, and its universal use as an industrial center, becomes manifest when one considers that in 1929 the assessed valuation of the twenty industrial plants above referred to aggregated over $20,000,000, and that the city in 1925 passed a zoning ordinance putting this area in the third industrial district, a zone in which stockyards, glue factories, coke ovens, steel furnaces, rolling mills and other similar enterprises were permitted to be located.

One has only to mention these facts to visualize the condition of the atmosphere in this locality. It is quite easy to imagine that many of the things of which the plaintiff complains are due to causes over which the defendant has no control. At any rate, if appellant is immune from the annoyance occasioned by the smoke and odor which must necessarily come from these various sources, it would hardly seem that she could consistently claim that her health has been impaired, and that the use and enjoyment of her home have been seriously interfered with solely because of the dirt, gas and stench which have reached her from defendant's plant.

It is very true that the law is no respecter of persons, and that

the most humble citizen in the land is entitled to identically the same protection accorded to the master of the most gorgeous palace. However, the fact that the plaintiff has voluntarily chosen to live in the smoke and turmoil of this industrial zone is some evidence, at least, that any annoyance which she has suffered from the dirt, gas and odor which have emanated from defendant's plant is more imaginary and theoretical than it is real and substantial.

I think that the trial court was amply justified in refusing to interfere with the operation of the defendant's coke ovens. No consideration of public policy or private rights demands any such sacrifice of this industry.

Plaintiff is not entitled to the relief which she seeks for another reason.

Subdivision 25 of section 20 of the General City Law (added by Laws of 1917, chap. 483) gives to the cities of this State authority to regulate the location of industries and to district the city for that purpose. Pursuant to such authority the common council of the city of Buffalo adopted an ordinance setting aside the particular area in which defendant's plant is situated as a zone in which coke ovens might lawfully be located.

After years of study and agitation it has been found that development in conformity with some well-considered and comprehensive plan is necessary to the welfare of any growing municipality. The larger the community the greater becomes the need of such plan. Haphazard city building is ruinous to any city. Certain areas must be given over to industry, without which the country cannot long exist. Other sections must be kept free from the intrusion of trade and the distraction of business, and be set aside for homes, where one may live in a wholesome environment. Property owners, as well as the public, have come to recognize the absolute necessity of reasonable regulations of this character in the interest of public health, safety and general welfare, as well as for the conservation of property values. Such is the purpose of our zoning laws.

After due consideration the common council of Buffalo decreed that an enterprise similar to that carried on by the defendant might properly be located at the site of this particular coke oven. It is not for the court to step in and override such decision, and condemn as a nuisance a business which is being conducted in an approved and expert manner, at the very spot where the council said that it might be located. A court of equity will not ordinarily assume to set itself above officials to whom the law commits a decision, and reverse their discretion and judgment, unless bad faith is involved. No such charge is made here. (*Morgan* v. *City of Binghamton*,

102 N. Y. 500; *Matter of Union Bank of Brooklyn,* 176 App. Div. 477, 486.)

Other defenses have been urged by the defendant, which it is unnecessary to discuss, in view of the conclusion which has already been reached.

I see no good reason why the decision of the Special Term should be disturbed. I think that the judgment appealed from should be affirmed.

All concur.

Judgment affirmed, with costs.